FILED

2007 JUL 24  AM II: 08

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Robert Henderson, *in pro per*
2111 Williams St., apt. 105
Long Beach, CA 90810
(562) 760-6241

## UNITED STATES DISTRICT COURT

### Northern California

### Oakland

Robert Henderson,
Plaintiff

Case no. C-072693-CW

v

Alameda County Medical Center,
Haapala, Altura, Thompson, Abern, L.L.P,
Defendants

First Amended Complaint
Demand for Jury Trial

1. **Jurisdiction** over this complaint arises under the laws of the United States including: 28 U.S.C. § 1332 and 28 U.S.C. § 1441. This complaint was filed within the two year statute of limitations after discovery of the violation as required by 42 U.S.C. §1983 and U.S.C. § 12101. The plaintiff has previously filed timely claims with both the above defendants in compliance with California law, including permission to file a late claim. However these claims were either denied or ignored by both defendants.

2. **Venue & Assignment.** This federal court is the appropriate venue as all of the acts complained of occurred in Alameda County Superior Court, Oakland, CA, case no. 20011029086, (hereafter as; Superior Court). And in

1

corresponding Superior Court-ordered mediation by a neutral 3rd party: Gary

Johnson of the firm: McNamara, Dodge, LLP, 1211 Newell Ave., Walnut Creek,

CA, (hereafter as; Mediation). As well as in California Appellate Court, 1st

District, Division 1, San Francisco, CA, case no. A109897, (hereafter as; Appeals

Court). The crime of attempted manslaughter occurred in Santa Clara County.

    3. The plaintiff, Robert Henderson, is a disabled veteran. He suffers from

severe and chronic, combat-related PTSD and depression. The U.S.

Department of Veteran Affairs, (hereafter as; VA) has rated the plaintiff as100%

disabled. He has been under treatment for his rated disabilities continuously by

the VA since December 3, 2000. The plaintiff's care by the VA includes:

hospitalization, ongoing medication, and psychological therapy—both individual

and group.

    4. The plaintiff's PTSD and depression are considered protected

disabilities under the Americans with Disabilities Act, 42 U.S.C. § 12101,

(hereafter as; ADA). And Section 504 of the Rehabilitation Act of 1973, as

amended: 29 U.S.C. § 794, (hereafter as: Section 504). Section 504 provides "no

qualified individual with a disability in the United States shall be excluded from,

denied the benefits of, or be subjected to discrimination under" any program or

activity that receives Federal financial assistance". JGP, through the Alameda

Medical Center, receives partial federal funding for its operations. JGP is

unequivocally bound by both the ADA and Section 504.

    5. There are two separate defendants in this U.S. District Court suit, case

no. C-072693-CW (hereafter as this Court). The first defendant is a California

2

public health entity: Alameda County Medical Center, responsible for and operators of, the John George Psychiatric Pavilion, 2060 Fairmont Dr. San Leandro, CA, (hereafter as JGP). The second defendant is the private law firm that represented JGP in Superior and Appeals Court in the cases cited above. This law firm is: Haapala, Altura, Thompson, Abern; 1939 Harrison St. #800, Oakland, CA, 94612-3527, (hereafter as HA). A partner in that firm: Clyde Thompson, California State Bar no. 72920, specifically handled the cases before Superior and Appeals Court, The above firm specializes in representing government defendants. When both JGP and HA are referred to together, they are (hereafter as Defendants).

6. The Defendants conspired to conceal multiple violations of California criminal and civil law by state employees in Superior Court and Appeals Court. The Defendant's illicitly utilized various California statutes that provide immunity for discretionary acts by state employees and agencies to obtain a summary judgment in Superior Court against the plaintiff. In California, statute immunity for a discretionary act is automatically barred to a state employee, or agency, if either or both, have committed a crime as a part of that alleged discretionary act. Here, in defense of that civil complaint, both defendants committed crimes in conspiring and constructing a fraudulent defense of immunity in Superior and Appeals Court. Under common law, and federal and California precedent, a private law firm cannot claim immunity from civil suit when it has participated in the commission of a crime. These crimes are violations of California Penal Codes: §182 (a) (1), (3) & (5) 'conspiracy', § 422.6 (a) 'injury to a person with a

3

disability under color of law', § 471.5 'falsification of medical records', § 401 'abetting a suicide attempt', § 664 (a), § 192 (b) 'setting events into motion that might have led to manslaughter', and California Health & Welfare Codes: § 8101 (a) 'return of a deadly weapon to patient on a California Welfare & Institution Code, § 5150; 72-hour hold.

7. The events and circumstances listed below are the facts and allegations of the plaintiff's complaint.

8. On the afternoon of November 30, 2000, the plaintiff attempted suicide through an overdose of sleeping pills and prescription muscle relaxers in the Economy Inn Motel, (hereafter as motel), 122 E. 12th St., Oakland, CA 94606.

9. On the morning of December 1, 2000, the plaintiff became homeless. He had been a resident of Alameda County, CA, for approximately six weeks.

10. Also on the morning of Friday, December 1, 2000, the plaintiff voluntarily sought the assistance of the VA Outpatient Clinic, (hereafter as Clinic), located at 2221 Martin Luther King Jr. Way, Oakland, CA, 94612, for help in dealing with his suicide attempt.

11. At the Clinic the plaintiff met with of Dr. Richard Karp, M.D., an internist at that facility.

12. On the afternoon of Friday, December 1, 2000, the plaintiff was taken into custody at the Clinic by the Oakland Police Department, (hereafter as Police). The plaintiff was taken into custody at the specific request of Dr. Karp. The plaintiff had agreed to be transferred to JGP for a 72-hour hold or an earlier admission to a VA psychiatric facility at Palo Alto, CA, on or before the following

4

Monday, December 4, 2000. The plaintiff acquiesced to being taken into custody by the Police. There was no incident.

13.  The Police were required by the Clinic to have signed a VA release form agreeing to take the plaintiff into custody and assume responsibility for that custody. The Clinic log book would also identify the police officer who took the plaintiff into custody, both by name and badge number, as well as verify the date and time, and the pendant circumstances. The Clinic's female receptionist, who handled documentation of the plaintiff's release to the Police, as well as Dr. Karp, would have specific knowledge of these events.

14.  The plaintiff will request this Court subpoena these documents and witness statements confirming all of items 10-13.

15.  Upon leaving the Clinic in the custody of the Police, the plaintiff was taken to the motel to pick up his personal luggage and other belongings being held for him by the manager. At the motel, the plaintiff agreed to permit the Police to search his luggage. At that time, a large and deadly 'fighting knife' was confiscated from the plaintiff's luggage by the Police. The 'fighting knife' was a deadly weapon as described in California Welfare & Institution Codes § 8100 & § 8103. The 'fighting knife' was correctly confiscated by the Police as the plaintiff was in custody. The Police were required by California Welfare & Institution Code § 8102 to perform this confiscation.

16.  After the 'fighting knife' had been collected by the Police, the plaintiff was further detained. He and all his belongings were held in custody by the Police at the motel until the arrival of an ambulance dispatched by the Oakland

5

Fire Department, (hereafter as Fire Department) at the request of the Police. See attached Exhibit A.

17.  At this time, the plaintiff, all his belongings including the 'fighting knife' were transferred to the custody of a highly experienced, three-man crew of paramedics of the Fire Department.  The paramedics came prepared for the worst.  All three were powerfully built and had specifically brought straight jacket to the motel for the purpose of restraining the plaintiff.  However the plaintiff cooperated completely and the straight jacket was not used.

18. This transfer of the plaintiff to JGP is documented and verified by a written Fire Department report.  Again, this report is attached here as Exhibit A.

19. At the motel, the plaintiff was strapped to a gurney and placed in a Fire Department ambulance. He had no access to any of his belongings or the 'fighting knife'.  The plaintiff had absolutely no control over any part of his situation.  He was not requested to sign any documents.  Again the plaintiff offered no resistance.

20.  The plaintiff was taken under these conditions to JGP, a mental health facility for the general public run by the Alameda County Medical Center. It is a security facility and is required to operate in strict accord with California law. The plaintiff was admitted while under the custody of the Fire Department to JGP.

21. The plaintiff was taken into JGP strapped to a gurney.  The three paramedics turned over all the plaintiff's luggage and belongings, including the 'fighting knife' to JGP security officials.  The plaintiff was transferred at that time

6

from the custody of the Fire Department paramedics to JGP. The plaintiff was then released from the gurney.

22. JGP was required to have signed a transfer of custody form releasing the plaintiff from the custody of the Fire Department into the custody of a public mental health facility.

23. The plaintiff will request this Court subpoena these documents and witness statements.

24. Upon arrival at the JGP the plaintiff was immediately admitted under California Welfare & Institution Code, § 5150 and placed on a 72-hour hold for his later planned transfer to the VA hospital in Palo Alto, CA. The 72-hour hold was documented in the plaintiff's admission records to JGP. The 72-hour hold is automatically required to be placed on all patients admitted to any public mental health facility in California while in custody. The 72-hour hold is an involuntary admission to any public mental health facility in California. In his deposition, a JGP employee freely admitted to the *de facto*-altering of the documented California Welfare & Institution Code, § 5150, 72-hour hold. The document was changed to a falsely claim the plaintiff's admission to JGP voluntary. California Welfare & Institution Code, § 7400 cannot be implemented when a patient is in custody on admission. This is confirmed by the April 21, 2004, deposition of Harsukh J. Savalia, JGP employee.

25. All the plaintiff's belongings including the 'fighting knife' were listed and stored by JGP security personnel. The plaintiff was permitted no access to any of his belongings including his reading glasses. The above referred to inventory

7

list, and the logging in of the plaintiff and his possessions; including the 'fighting knife' authenticates the plaintiff having arrived at JGP on the afternoon of Friday, December 2, 2000, in the custody of the Oakland Fire Department. This document was unwittingly obtained during discovery by the plaintiff's lawyer in Superior Court, but never examined by that court.

26. Though the plaintiff voluntarily had sought treatment from the VA, and cooperated with both the Police and Fire Department in his removal from the Clinic, then the motel; he clearly was in custody when admitted to JGP. The U.S. Supreme Court has already determined what constitutes custody in Florida v. Bostick (1991) 501 U.S. 429. And by this test, the plaintiff was plainly in custody when admitted to JGP. The Police and Fire Departments are not a taxi services. Had the plaintiff been a voluntary admission to JGP, he could have simply been sent to JGP by a VA vehicle from the Clinic. There would have been no need for either the Police or Fire Department. The chain of the plaintiff's custody from the Clinic to JGP was unbroken. There was no time when the plaintiff was in the custody of the Police or Fire Department that he could have, of his own volition, simply walked away.

27. Immediately after entering JGP, the plaintiff was examined by a JGP doctor, later stabbed to death by a patient at JGP. The plaintiff's attorney was never provided the opportunity to question the murdered doctor. The other, a Dr. Zeller, M.D., an alleged psychiatrist at JGP, met briefly with the plaintiff. Zeller immediately and maliciously informed the plaintiff he had very little chance of ever recovering and in addition, the VA had no intention of ever treating him.

8

28. On the afternoon of Saturday, December 2, 2000, nearly 18 hours after his meeting with Zeller the plaintiff was accosted in a large, general patient area at JGP by another of the facilities alleged psychiatrists: Harsukh J. Savalia, M.D. Savalia refused to identify himself, conduct an interview of the plaintiff, or answer any of the plaintiff questions regarding his mental health. Savalia threatened to discharge the plaintiff if he refused to take a proffered psychotropic medication. When the plaintiff questioned whether the medication was authorized by the VA, Savalia angrily ordered the plaintiff's immediate and involuntary discharge from JGP, telling him "he could sleep elsewhere!"

29. Savalia's malevolent dealings with the plaintiff were a blatant act of discrimination. JGP was in specific violation of the ADA, Section 504, and California Health & Welfare Code § 5325.1 (c). This statue protects both voluntary and involuntary patients from "A right to be free from harm, including unnecessary or excessive physical restraint, isolation, medication, abuse, or neglect. *Medication shall not be used as a substitute for treatment.*" It took the plaintiff's attorney nearly two years after filing suit to identify Savalia.

30. As claimed above, the plaintiff did not agree to the discharge. The plaintiff was not permitted use of his reading glasses to review any document he was required to sign by JGP regarding his involuntary discharge. JGP employees in written statements obtained during discovery but never examined by Superior Court characterized the plaintiff's protests and questions regarding his involuntary discharge as 'suspicious'.

31. This document was unwittingly obtained during discovery by the plaintiff's lawyer in Superior Court, but never examined by that court.

32. Upon his involuntary and illegal discharge from JGP, the plaintiff's luggage and other belongings; including the confiscated 'fighting knife' were unlawfully returned to him. This criminal act by JGP employees placed the plaintiff in direct harm.

33. The return of the 'fighting knife' was in specific defiance of the California Welfare & Institution Code § 8102 (a) 'return of a deadly weapon to patient on a California Welfare & Institution Code, § 5150; 72-hour hold. This is the act described below in following item 34. This criminal act posed a dangerous threat both to the plaintiff and the public safety of the People of California. This threat is obviously demonstrative by the extraordinary precautionary measures taken by the name-unknown, JGP psychiatric technician who returned the 'fighting knife' to the plaintiff. In addition, JGP is guilty of unlawfully discharging a patient before expiration of a California Welfare & Institution Code, § 5150, 72-hour hold. As described above in item 24, the 72-hold was automatically required as the plaintiff had been admitted to JGP in the custody of the Fire Department, having been transferred from the immediate custody of the Police.

34. The circumstances of the 'fighting knife's' return are as follows: the plaintiff was instructed to stand in the JGP parking lot after his involuntary discharge. The plaintiff waited over an hour before the JGP technician partially showed himself from a JGP hospital doorway. The JGP technician ordered the

10

plaintiff to back 50-60 feet further away into the parking lot, far from the hospital door. The plaintiff did as he was instructed. This JGP technician then emerged from the building perhaps 5-6 feet carrying the plaintiff's luggage and belongings. The 'fighting knife' was attached in a clear plastic bag outside the plaintiff's luggage in plain view of the delivering JGP technician. The technician sat all the plaintiff's bags, including the exposed 'fighting knife' at the edge of the parking lot, at least 50 feet from the plaintiff. The JGP technician then ordered the plaintiff to make no move toward the knife and luggage until he, the technician, had returned safely inside JGP and locked the door.

35. Though the JGP realized the plaintiff was homeless, in addition to being armed with a deadly weapon, they claim to have arranged for the plaintiff to return a week later as an outpatient at JGP. Apparently welcome to come back with his fighting knife in tow if he so chose.

36. This is confirmed by the April 21, 2004, deposition of Harsukh J. Savalia, JGP employee.

37. The return of the deadly fighting knife resulted in an almost immediate second suicide attempt by the plaintiff. This same 'fighting knife' was used by the plaintiff to violently slash his wrists on the evening of December 2, 2000, in Palo Alto, CA. The plaintiff was discovered near-death and immediately taken by Palo Alto Fire Department paramedics to the Stanford University Hospital Emergency Room, Palo Alto, CA. At the emergency room, a staff psychiatrist immediately diagnosed the plaintiff as suffering from severe clinical depression. The plaintiff was subsequently transferred to a VA psychiatric facility the next day, the

afternoon of December 3, 2000. The plaintiff was immediately placed on medication and has been under the continuous medical treatment by the VA since.

38. Subsequently as part of his VA psychological therapy, the plaintiff was urged to write about the events leading to his suicide including his custody by the Police and Fire Departments.  The plaintiff did so, creating a hand-written journal over approximately a month in December, 2000, describing all the events above. This journal was written approximately two-to-three months before the plaintiff hired an attorney.

39. The plaintiff's journal is independently substantiated plaintiff's VA therapist Dr. Doug Lindenburg, in his notes of the plaintiff's treatment during December, 2000.

40. The plaintiff's journal was submitted into evidence in Superior Court only. Yet Superior Court made no mention of the journal, (Exhibit B) in its decision granting Summary Judgment to the defendant.  HA argued vociferously against Appeals Court inclusion and review of any part of the plaintiff's journal.

41. At the urging of VA medical staff, the plaintiff retained an attorney while still a homeless patient at the Menlo Park, CA, VA, where he was being treated and medicated for severe clinical depression.  Lucy Bedolla Mejia, state bar no. 149205, San Bruno, CA, 94066, was hired in February, 2001, to represent the plaintiff in Superior Court.

42. Mejia's representation was fundamentally defective from its onset. Mejia failed to accurately research or plead key facts of the case in Superior

12

Court. She made a critical error in omitting the plaintiff's being in the custody of the Police and Fire Departments. No part of her complaint referred to the plaintiff's transfer from the VA Outpatient Clinic in Oakland, to his arrival at JGP in San Leandro, while in the custody of the Police and Fire Departments. When the plaintiff pointed out to Mejia her complaint did not mention his being in custody of the Police and Fire Departments; the attorney ineptly claimed the custody issue was irrelevant. Mejia chose instead to ineffectively pursue claims for professional negligence and JGP's failure to meet a normal standard of care.

43. The subject of the plaintiff's being in custody was and is evidence of a criminal violation. The Defendants' capitalized on Mejia's professional ineptitude to specifically hide the facts of the plaintiff being in the custody of the Police and Fire Departments. This act alone diametrically belies the Defendants' claims of discretional statute immunity.

44. The required and unequivocal result of the plaintiff being in the custody of the Police and Fire Department, described above in items 12-24, led to the plaintiff's involuntary admission to JGP.

45. In a sworn deposition taken in HA's law offices on April 21, 2004, JGP employee: Savalia explicitly admitted to changing the plaintiff's admission status on official state medical records from 'involuntary' to 'voluntary'. Yet in the same deposition Savalia divulged not being present at the plaintiff's admission to JGP. Of course these facts remained irrelevant as long as Mejia remained in the dark about the Defendants' crimes.

13

46. This conduct is further reflected in HA's determined misdirection of Mejia in the plaintiff's deposition. Taken May 28, 2004, in HA's law offices, the defendant's attorney purposefully required the plaintiff skip the events of his being taken into custody in order to avoid it being made part of the record. However immediately following this maneuver, HA questioned the plaintiff as to if his admission to JGP had been voluntary? This query was insurance to Superior Court that there would be no future challenge by the plaintiff of the circumstances of his admission to JGP. As HA figured, Mejia made no objection or even queried the custody issue and the Defendant's were thus able to not only steadfastly discriminate against the plaintiff, but successfully perpetrate over a half-dozen violations of the California Penal Code. The Defendants' calculatingly denied the plaintiff his constitutional protections of 'due process' and 'equal protection under law' through the nefarious guise of 'color of law'.

47. Though Superior Court ordered mediation by a neutral third party—on the morning of May 27, 2004, Thompson, by telephone from the mediator's office, obtained final authorization from the Alameda County Hospital Board to construct a conspiracy in violation of California Penal Code §182 (a) (5). This occurred immediately after the Defendant's first and only meeting with Mejia and the plaintiff. The Alameda County Medical Board was frightened that Mejia, characterized by Thompson; as a 'very bad lawyer looking for a quick and lucrative payday', would inadvertently discover the pertinent relevancy of the custody issue. This would drastically alter the plaintiff's pending claim and the complaint for damages would automatically exceed the $250,000 statutory limit.

14

Superior Court would base its decision entirely on Mejia's failure to discover the critical significance of the plaintiff being in both Police and Fire department custody at the time of his admission to JGP. And further, that while Superior Court would admit the plaintiff's journal into evidence, 'under no circumstances' would the incriminating and contradictory evidence of the journal be scrutinized or brought up in court. The admission of the journal was solely to protect Superior Court in the unlikely event 'things went wrong'. With this safeguard in place, Superior Court could claim in the future it had simply made the wrong decision. Again, Thompson was confident the conspiracy would go uncovered as Mejia had never filed an appeal in her career and Superior Court's decision 'would never be challenged'. Conspiracy to hide a criminal act is not information protected by work-product or client-confidentially. In addition, the conspiracy was constructed in the presence of a party employed by Alameda County who is not an attorney.

48. The plaintiff will request this Court subpoena this witness for a declaration regarding these events.

49. The Defendants specifically misused Mediation to continue purposefully distracting Mejia from any possible discovery of their conspiracy. They did this though a series of diminutive and slighting offers, HA knew the plaintiff neither would nor could accept. Another key part of the Defendant's subterfuge was to anger Mejia and the plaintiff through determined malice and insult; e.g. Thompson claimed the plaintiff's attempted suicide was a 'non-event'.

15

50. While abusing Mediation, the Defendants constructed an unlawful affirmative defense based on concealment of key facts and a criminal use of immunity statutes for public employees as described above. As the direct result of the Defendant's successful conspiracy; a summary judgment against the plaintiff was granted by Superior Court. That court also awarded the Defendant's over $8000 in attorney fees.

51. Superior Court, as previously stated above in item 47, applied Mejia's incompetent testimony at the summary judgment hearing: that the plaintiff had been voluntarily admitted to JGP, as the basis for its judgment. This decision purposefully ignored the plaintiff's written testimony of his journal; specifically stating the circumstances of his custody and delivery to JGP. Instead Superior Court demanded Mejia testify that the plaintiff's admission to JGP had been voluntary. The plaintiff, a resident of Southern California, was not present at the summary judgment hearing to contradict Mejia's testimony. When the plaintiff obtained a copy of the summary judgment hearing transcript it was obvious Mejia had never read the plaintiff's journal. Mejia certainly had not been present at plaintiffs' admission to JGP and clearly had no comprehension of the custody issue. The Defendants failed to provide Superior Court with any evidence or testimony of anyone, present at the plaintiff's admission to JGP, who could dispute the issue of custody in the plaintiff's journal. Through the Defendants planned machinations, both Superior and Appeals Court could rely safely and entirely on Mejia's iniquitous testimony.

52. Had Mejia been competent enough to see through the Defendants' masquerade, she would have not dismissed the plaintiff's custody concerns of the initial complaint; described above in items 42-43. In-turn, had she been aware that a crime had taken place in JGP's return of the 'fighting knife' to the plaintiff because of his involuntary admission to JGP, in the custody of the Police and then Fire Departments, Mejia could have protested Superior Court's abject denial of the plaintiff's written testimony. Though even as Mejia failed miserably as a lawyer, the multiple crimes undertaken by the Defendants' against the plaintiff are neither legitimate nor moral, and cannot be justified simply because they were not discovered at the time. It is neither Mejia, nor the plaintiff's duty, as an untrained *pro se,* to enforce the California Penal Codes. The journal testimony was written less than a month after the plaintiff's second suicide attempt occurred and two months before Mejia was even hired. The plaintiff's journal is direct evidence of a criminal violation by the Defendants. The plaintiff's journal was substantiated by a third party at the time it was written. When the plaintiff attempted to document these same criminal violations with the evidence of either Exhibits A or B, Appeals Court flatly, though not surprisingly, refused to examine the evidence.

53. As the Defendant's planned, with Superior Court's issue of summary judgment, Mejia deserted the plaintiff. Despite his obvious inexperience, lack of training, and operating with a substantial disability as recognized by the ADA, the plaintiff filed an appeal *in pro per.* It was not until he had taken over his own case that the plaintiff uncovered evidence of the Defendant's conspiracy.

54. When he filed his appeal, the plaintiff failed to designate the record on appeal. As stated above in item 52, and though it was in their power, Appeals Court refused to allow the plaintiff to present any evidence of the Defendants' crime. HA argued in Appeals Court that the plaintiff's journal had "no merit" as evidence and that the plaintiff did not explain how his journal would have altered Superior Courts decision. The plaintiff does so here and now.

55. The Fire Department report; Exhibit A, is documented evidence from a neutral third party proved crimes by the Defendants'. The plaintiff did not uncover these offenses by the Defendants', or uncover the Fire Department report, until after he had begun his appeal.

56. As stated above in item 3, the plaintiff suffers from documented, pre-existing severe and chronic, combat-related PTSD and depression. Since the beginning of the plaintiff's participation in this suit acting *in pro per*, he has suffered a marked and significant increase in his unremitting illnesses through cycles of exhaustion, sleeplessness, crippling periods of anxiety, intense headaches, severe tremors, an inability to concentrate, and considerable weight gain to the point of obesity resulting in hypertension. These are all VA documented physical illnesses and maladies both needlessly inflicted, and or exacerbated, by the extensive emotional distress endured by the plaintiff; as a result of the Defendants' focused conspiracy. Not only has the plaintiff been deprived of his constitutional protections of to 'due process of law' as provided by the 5th amendment, and to 'equal protection under law' by the 14th amendment of

the U.S. Constitution, but he has been required to bear unnecessary, punitive injury to his health as well.

57. The unexamined proofs of the Defendants' conspiracy are much more than critical issues of material fact. They are evidence of specific criminal violations by the Defendants. Both Superior and later, Appeals Court permitted the above described crimes against the plaintiff to be camouflaged as discretionary acts protected by California immunity statutes. Had either Superior or Appeals Court, not even critically, but simply, examined the plaintiff-submitted evidence of the case; they would have been required to charge the defendants with the commission of a series of crimes against the plaintiff and the People of California. Both Superior and Appeals Courts failed wretchedly to defend and protect both the laws of California and the Constitution of the United States of America.

### First cause of Action

As described above the Defendants discriminated against the plaintiff as a disabled person under the ADA § 12132. The Defendants repeatedly conspired both before and after the fact, to deny the plaintiff equal access, specific legislative protections, and use of the facilities and services of a public entity— JGP.

Second cause of Action

As described above the Defendants discriminated against the plaintiff as a disabled person under Section 504 of the Rehabilitation Act of 1973, as amended: 29 U.S.C. § 794. The Defendants repeatedly conspired before and after the fact to cloak JGP's unlawful discrimination against the plaintiff.

Third cause of Action (2 counts)

As described above the Defendants repeatedly conspired to deny the plaintiff fair judicial hearings in Superior and Appeals Court. They unlawfully sought and received an award for money damages against the plaintiff in obtaining a summary judgment in Superior Court and having the same judgment upheld with an award for additional moneys in Appeals Court. In taking these actions, the Defendants resolutely chose to violate 42 U.S.C. §1983 through the pretense of 'color of law' by forswearing the plaintiffs constitutional rights to 'due process of law' as provided by the 5th amendment, and to 'equal protection under law' by the 14th amendment of the U.S. Constitution.

Fourth cause of Action: (3 counts)

As described above the Defendants conspired to violate the following California Penal Codes: §182 (a) (1), (3) & (5), before and after the fact. In taking these actions, the Defendants resolutely chose to violate 42 U.S.C. §1983 through the pretense of 'color of law' by forswearing the plaintiffs constitutional rights to 'due process of law' as provided by the 5th amendment, and to 'equal protection under law' by the 14th amendment of the U.S. Constitution.

Fifth cause of Action

As described above the Defendants conspired to violate California Penal Code §
422.6 (a) 'injury to a person with a disability under color of law' before and after
the fact. The Defendants resolutely chose to violate 42 U.S.C. §1983 through the
pretense of 'color of law' by forswearing the plaintiffs constitutional rights to 'due
process of law' as provided by the 5th amendment, and to 'equal protection under
law' by the 14th amendment of the U.S. Constitution.

Sixth cause of Action

As described above the Defendants conspired to violate California Penal Code
§ 471.5 'falsification of medical records' before and after the fact.  The
Defendants resolutely chose to violate 42 U.S.C. §1983 through the pretense of
'color of law' by forswearing the plaintiffs constitutional rights to 'due process of
law' as provided by the 5th amendment, and to 'equal protection under law' by the
14th amendment of the U.S. Constitution.

Seventh cause of Action

As described above the Defendants conspired to violate California Penal Code §
401 'abetting a suicide attempt', before and after the fact. The Defendants
resolutely chose to violate 42 U.S.C. §1983 through the pretense of 'color of law'
by forswearing the plaintiffs constitutional rights to 'due process of law' as
provided by the 5th amendment, and to 'equal protection under law' by the 14th
amendment of the U.S. Constitution.

Eighth cause of Action (two counts)

As described above the Defendants conspired to violate California Penal Codes § 664 (a), § 192 (b) 'setting events into motion that might have led to manslaughter', before and after the fact. The Defendants resolutely chose to violate 42 U.S.C. §1983 through the pretense of 'color of law' by forswearing the plaintiffs constitutional rights to 'due process of law' as provided by the 5th amendment, and to 'equal protection under law' by the 14th amendment of the U.S. Constitution.

Ninth cause of Action

As described above the Defendants conspired to violate California Health & Welfare Codes: § 8101 (a) 'return of a deadly weapon to patient on a California Welfare & Institution Code, § 5150; 72-hour hold for before and after the fact. The Defendants resolutely chose to violate 42 U.S.C. §1983 through the pretense of 'color of law' by forswearing the plaintiffs constitutional rights to 'due process of law' as provided by the 5th amendment, and to 'equal protection under law' by the 14th amendment of the U.S. Constitution.

Exception

The plaintiff requests this Court take notice that California Civil Code 3333.2, limiting damages for noneconomic losses in medical malpractice actions to $250,000, does not apply to an action brought based on fraud, willful neglect, malicious, or criminal acts; see Baker v Sadick (1984, 4th Dist) 162 Cal App 3d 618.

The plaintiff requests a jury trial.

The plaintiff requests this Court file a criminal complaint with the U.S. Attorney against both the Defendants.

Against the defendant Alameda County Medical Center the plaintiffs requests compensatory and special damages to be determined by jury award.

Against the defendant Haapala, Altura, Thompson, Abern, L.L.P, the plaintiff requests compensatory, special, and punitive damages to be determined by jury award.

The plaintiff requests this Court further charge the Defendants' with any additional accusations, and accordingly award the plaintiff any applicable damages it deems fitting and proper.

Robert Henderson, *in pro per*

July 23, 2007

Exhibit A

Oakland Fire Department report dated December 12, 2000

(2 pages)

```
07:56:04 10-06-05          FIRE REPORTING SYSTEM              PAGE   1
                              INCIDENT REPORT
                         INCIDENT 200057195 EXP. 00
                          DATE 12/01/00   TIME
```

LOCATION : 122 EAST 12 STREET

```
Type of Situation Found :
Person 1.
 Affiliation .......... :
 Name ................. :
 Telephone ........... :
 Street .............. :
 City ................ :
 State ............... :   Zip :
Person 2.
 Affiliation .......... :
 Name ................. :
 Telephone ........... :
 Street .............. :
 City ................ :
 State ............... :   Zip :
General Property Use .. :
Specific Prorerty Use . :
Mobile Property Involved.
  Property Type ....... :
  Vehicle Lic No. ..... :
  Vehicle Lic State Yr  :
  Vehicle Make ........ :
  Vehicle Model ....... :
  Vehicle D.O.T. ...... :
  Vehicle ID Number ... :
  Driver's Lic#/State . :
Type of Action Taken .. :
Fire Origin Area ...... :
Ignition Factor ....... :
Material First Ignited.
  Type ................ :
  Form ................ :
Estimated Property Loss :
Estimated Contents Loss :
Type Detection System . :
Detect. System Perform. :
Type of Extinguish. ... :
Civilian Injuries ..... :   Civilian Fatalities :


Report Completed by ... :
Officer in Charge ..... :
```

Incident Notes

```
UNIT  TYPE  DISPATCH  RESPOND    ON-SCENE   TRANSPORT   AT HOSP.   AVAILBLE
----  ----  --------  --------   --------   --------    --------   --------
5517   A    15:55:03  15:55:44   16:03:25   16:09:01
Complainant phone: OPD 15:52:55
Response area: 3346 15:52:55
OPD ON SCENE (LML) 15:53:33
```

```
07:56:04 10-06-05           FIRE REPORTING SYSTEM              PAGE    2
                               INCIDENT REPORT
                          INCIDENT 200057195 EXP. 00
                            DATE 12/01/00   TIME

LOCATION : 122 EAST 12 STREET


Ambulance service incident 0299917] 15:53:38
INCIDENT RECVD BY CREW AT [MNJ]] 15:55:13
```

Exhibit B

Hand-written journal of plaintiff, Robert Henderson, dated December 18-20, 2000

Original filed with Alameda County Superior Court, Oakland, CA

Case no. 20011029086

(8 pages)

(5)

MONDAY, DECEMBER 18, 2000

When I was tossed out of this ALAMEDA PSYCH FACILITY, the KNIFE was sitting in a plastic bag ATTACHED to the handle of one of my BAGS. THE PERSONNEL THERE MADE ME STAND OUTSIDE THIS FACILITY, then they bought my bags to me. IT was LUDICROUS. They KNEW WHAT I was going to do, they JUST DIDN'T want me DOING IT on their PROPERTY. I OBLIGED. I CAN REMEMBER I WANTED TO DIE in A PLACE WERE I been HAPPIEST, PALO ALTO. This ALAMEDA PSYCH FACILITY, I thought, was supposed to WATCH me FOR the WEEKEND, then SHIP me TO this PALO ALTO VA. I THOUGHT it was SET. On NOV 30, that THURSDAY, I had tried TO DO myself in with A COMBINATION OF 60 OVER-THE-COUNTER BENYDRIL, some MUSCLE-RELAXERS FROM a year OLD VA PRESCRIPTION, and WHAT was left in A BOTTLE OF migraine EXCEDRIN. I WASHED it ALL down with A long-necked bottle OF CORONA. My hand DIDN'T SHAKE THAT FIRST TIME EITHER SWALLOWING the PILLS. It WAS JUST BUSINESS.

Cont. Monday, December 18, 2000 (6)

I was centered, at peace. For so many mornings
before, the first thing I thought of
after waking was how peaceful it would
be to just slip off in my sleep.
The drugstore combo slumbo such a
simple unobtrusive answer. My
suicide note was short. I apologized
for the mess, asked to be cremated
and my ashes interred at the VA
cemetery high up on 280 looking out
over the bay. I told the coroner there
was no one to notify. This was a lie.
My rent was due Friday, at 11 am.
I did the deed at 1 pm Thursday, figuring
they find me dead the following day.
I packed my bags, all that was left
was to stop breathing. Some time that
night I came to. There had been no
dreams, no out-of-body experience, just
black. Nothing. What I had always, I think,
expected. But awake I had a terrible
urge to urinate. I felt like I was swimming
in nothing. Somehow I rolled out of bed
and squirmed to the toilet. I struggled,
bought my way up the bowl to where
I could urinate. Then crawled back to bed.
About 10 am Friday morning I awoke.

Cont. Monday, December 18, 2000    

I was alive, broke and helpless. The knife was there, but then it never occurred me to use it. I went to the Oakland VA. For the year before, my sister had desperately tried to get me to go to the VA and be treated for depression. I had refused, now I thought it was time. I left my bags in the master office and walked over to the Oakland VA. I met a Dr. Karp, we had been undergraduates at UCLA at the same time. I told him what I had done.

Tuesday, December 19, 2000

Protection. I expect that was what I was after. Why I could not simply provide it for myself I don't know. I wasn't angry, I was frightened. But I don't why. ——> I sought comfort in sleep, quiet, and privacy. Dr. Karp called to have me admitted to the Palo Alto VA, but there was no bed space. He arranged for me to be admitted to the John George Alameda County Psych Clinic for the weekend. They were to watch me, then send me to Palo Alto. An Oakland

(8)

cont. Tuesday, Dezember 19, 2000

COP, A NICE FELLA, PICKED ME UP AT
the VA. I RODE in the FRONT SEAT AND
WE TALKED ABOUT THE LOCAL POLICE SCANDAL.
HE ASKED ME ABOUT MY WRITING. WE drove
to MY MOTEL AND PICKED UP MY LUGGAGE.
HE ASKED IF I HAD A WEAPON. I dug the
KNIFE OUT OF MY bag AND GAVE IT TO him.
A 3 MAN AMBULANCE CREW MET US AT the
MOTEL. I said GOODBYE TO the COP. The
AMBULANCE guys WHO WERE Also REAL NICE
TOOK ME TO John George. I WAS CHECKED
in there by a black woman, who RAN
SECURITY. She SEEMED ANGRY I WAS there.
She said they WEREN'T RUNNING A hotel.
She TAGGED MY STUFF, SENT ME OUT TO
wait in the lobby. A couple of hours later
A DR. ZELLER CAME OUT. HE SEEMED AS ANGRY
AS THE SECURITY GUARD. ZELLER HAD me
sign A COMMITMENT FORM. AFTER that, he
TOLD ME the VA WAS RUNNING A SCAM ON me.
All DURING this time he was teasing one
of the INMATES, A BLACK WOMAN WHO
couldn't VERBALLY defend HERSELF AND ENDED up crying
and shouting AT him. This made ZELLER
laugh. HE wasn't much of a DOCTOR.
I SPEND the night IN A big open ROOM

CONT. TUESDAY, DECEMBER 19, 2000

(9)

ON A CHAIR-BED. SO I COULD BE WATCHED.
THE LIGHTS WERE ALWAYS ON. I DIDN'T
SLEEP VERY WELL. NO ONE EVEN TOOK MY
HISTORY OR EVEN ASKED ME ABOUT MY
PROBLEM. THEY TOOK SOME BLOOD IN THE
MORNING. AN HOUR OR SO LATER A TALL MAN
WITH EITHER AN INDIAN, OR PAKISTANI ACCENT
WALKED BRISKLY INTO THE BIG OPEN ROOM
SHOUTING MY NAME. I RAISED MY HAND.
HE SHOVED A CLIPBOARD INTO MY FACE AND
TOLD ME TO SIGN. IT WAS PERMISSION TO
MEDICATE ME. NO ONE HAD TAKEN MY
HISTORY. HE CLAIMED HE WAS A PSYCHIATRIST
AND TOLD ME IF I DIDN'T SIGN I COULD SLEEP
ELSEWHERE. I ASKED HOW HE COULD MEDICATE
ME WITHOUT KNOWING WHAT WAS THE
MATTER WITH ME? HE GOT ANGRY AND TOLD
ME TO GET OUT. AN HOUR I WAS OUT ON THE
STREET WITH DIRECTIONS TO A homeless SHELTER,
AND A TICKET TO BART, AND MY KNIFE. RIGHT
THEN, IT WAS CLEAR.


WEDNESDAY, DECEMBER 20, 2000

DR. KARP FROM THE OAKLAND VA HAD GIVEN
ME HIS CARD. I CALLED THIS NUMBER BUT
THERE WAS NO ANSWER. I CALLED

(10)

CONT. WEDNESDAY, DECEMBER 20, 2000

MY SISTER DOWN in OJAI. TOLD her
I WAS WORKING, An OUTRIGHT lie, then
told her not to send anymore money.
TOLD her THERE BE no way FOR US TO
STAY in touch, BUT I would call, ALSO
A lie. I told her I loved her very
much and THANKED BOTH HER and her
husband FOR All this help they had
GIVEN me. JUST ABOUT this only honest
thing I UTTERED in this ENTIRE conversation
I RODE THE BART TO Colma, then took A
BUS DOWN Camino Real to Palo Alto. THERE was
A Mild sense of happiness about THE TRIP.
I REALIZED THAT A DECADE BEFORE TO this
Day, I had sold MY FIRST novel to MRS.
ONASSIS at DOUBLEDAY. BEATRICE'S ACTUALLY
HUGGED me WHEN SHE got off the phone
with her. Plans WERE BEING made TO go
BACK to New York, it was A giddy time for
BOTH BEATRICE and me. SOMEHOW this memory
of that time had INFUSED ITSELF, and though I
knew I was going to committ SUICIDE,
that seemed less important than this memory.
I STOPPED AT the GOOD EARTH on UNIVERSITY,
I have FONDNESS FOR their SPICY ICE TEA.
That took ABOUT MY LAST $2. When I lived
with BEATRICE I ATE AT the GOOD EARTH

cont. Wednesday, December 20, 2000   (11)

just about every week night. I walked
down University as if I went going
home that night. When I made it to
the condo, I stood there for a moment,
remembering how happy I had been.
The memory was warm and made me
feel good. But when I left, I knew it
was time to get down to business. It was
cold, but very clear. I found a place about
2 blocks from Bea's on Middlefield. It was
a big old corner house used as a business for
golf course design. The house was in a
residential area, and it was so very
quiet. There was an L shaped driveway
that ran down the backside of the house
from the side street, then broke and ran
down the length of the house to Middlefield Rd.
It was perfect. I found good position and
cover, careful as if I were setting up
a machinegun. Set my bags at my back
so I could watch the sky, then pushed up
both my sleeves. The knife was in my big
bag. I removed it from the scabbard and
held my arms and wrists up to catch what
light I could from the moon. I was very
steady and clear-headed when I made the
first cut. It was long and deep and blood
raced after the blade. Being thorough, I made

CONT. WEDNESDAY, DECEMBER 20, 2000          (12)

A SECOND CUT ABOUT 2 INCHES DOWN FROM THE FIRST. I KNEW I WAS GOING THOUGH TENDON AND NERVE BUT IT WAS NECESSARY TO FINISH THE JOB. I'M RIGHT-HANDED SO THE CUTS WERE MADE ON MY LEFT WRIST. I SWITCHED HANDS WITH THE KNIFE. THE SWITCH WAS SMOOTH, THEN I CUT MY RIGHT WRIST. I PUT MY HANDS DOWN AND SAT UPRIGHT THINKING THE BLOOD WOULD POUR OUT FASTER. I REMEMBER MY BLOOD WAS SO WARM, I COULD FEEL IT SEEPING INTO MY JEANS AND DOWN THE DRIVEWAY. I CONCENTRATED ON THE SKY. THERE WAS A VERY BRIGHT STAR OR MAYBE A PLANET IN THE SOUTH THAT NIGHT. IT WAS SO VERY, VERY QUIET.

## PROOF OF SERVICE BY FIRST-CLASS MAIL

I declare I am a resident of Los Angeles County, over 18. My address is 2121 Williams St., apt I, Long Beach, CA 90810. I am not a party to:

UNITED STATES DISTRICT COURT
Northern California, Oakland

Robert Henderson,
Plaintiff

Case no. C-972693-CW

V

Alameda County Medical Center,
Haapala, Altura, Thompson, Abern, L.L.P,
Defendants

I have placed true copies of 'First Amended Complaint and Demand for Jury Trial, with attached Exhibits A & B, in the above titled matter in the U.S. Mail with first-class postage attached, on July 23, 2007 at the U.S. Post Office, Long Beach, CA. These true copies were mailed to:

Clerk of the Hospital Authority Board
Alameda County Medical Center, (a Public Hospital Authority),
(Agent of Service for the John George Psychiatric Pavilion)
Fairmont Hospital
Executive Offices
15400 Foothill Boulevard
San Leandro, CA  94578

John E. Haapala (partner)
Haapala, Altura, Thompson, Abern, L.L.P
1939 Harrison St.
Oakland, CA  94612

*Edward H. Brandner* (signature)

Edward H. Brandner

July 23, 2007